THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CECIL YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | No. 24 C 00487 |
| | ) | |
| v. | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| CITY OF JOLIET, and Joliet Police Detective KRISTOFF PETRO, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

In October 2022, Plaintiff Cecil Young was arrested by Joliet Police Detective Kristoff Petro and taken into custody for three days for allegedly violating an Interim Order of Protection (OP). Young subsequently sued the Detective and the City of Joliet alleging Fourth Amendment claims for false arrest, unreasonable pretrial detention, and malicious prosecution under 42 U.S. Code § 1983 and state law. The Detective and the City move for summary judgment claiming that there is no genuine issue as to any material fact as to whether Detective Petro had probable cause to sign the criminal complaint against Young and, alternatively, that Petro has qualified immunity. For the following reasons, the Court grants Defendant's Motion [29].

## BACKGROUND

The following facts are undisputed, except where noted.[1]

---

[1] Young objects to numerous of Defendants' Local Rule 56.1 statements. (Dkt. 34 ¶¶ 5–15, 24–30, 32–33, 42, 46, 48, 50–51, 61–62). Many of these objections lack merit. To the extent that some of Defendants' statements lack adequate evidentiary support, they are not credited in this Opinion. The objections relevant to the facts upon which the Court relies are resolved in the Background section.

1

I. **The OP and Alleged Violation**

In March 2022, Young's ex-wife, Dr. Natalie Young ("Natalie"), filed a petition for an OP against him on behalf of their two daughters, CY, age 14 ("CY-14"), and CY, age 11 ("CY-11"), in the Circuit Court of DuPage County, Illinois. (Dkt. 31 ¶ 5). At an evidentiary hearing in May 2022, CY-14 testified that she and her sister had a physical altercation with Young during which he repeatedly struck CY-11 with a closed fist, shoved CY-14, and pressed her face into a mattress such that she was unable to breathe. (Dkt. 31-4 at 33:24–37:4, 42:1–18, Exhibit D – Transcript of Evidentiary Hearing). Following the evidentiary hearing, the court found that Young had engaged in domestic violence and issued an OP, valid for the next three months. (*Id.* at 101:3–102:10). At the hearing, the judge told Young that the OP meant that other than attending mandatory family counseling, he should not have any contact with CY-11 or CY-14. (*Id.* at 102:9–10). The physical copy of the OP also indicated the terms that Young was to "stay away" from his daughters and have "no contact" with them. (Dkt. 31-3 at 2, Exhibit C – Order of Protection). The OP stated that it was enforceable from May to August 2022. (Dkt. 31-3 at 1). Young was served with the OP before he left the courtroom on May 10, 2022. (Dkt. 31 ¶ 16).[2]

On July 4, 2022, Plaintiff attended a Fourth of July party where Natalie and CY-11 were also in attendance. (Dkt. 31-6 at 9:5–24, 10:1–4, Exhibit E – Cecil Young Deposition). When

---

[2] Young objects to several of Defendant's fact statements that refer to events that occurred prior to Petro's investigation. (Dkt. 34 ¶¶ 5–15). Young objects to these facts on the ground that they are irrelevant and immaterial to Defendant's summary judgment motion, given that the probable cause inquiry is limited to what Defendant Petro knew at the time she signed the criminal complaint against Young. (*Id.*) Because there is no evidence that Petro was aware of the information contained in those statements of material fact, Young contends that the Court must disregard the statements. (*Id.*)The Court overrules the objections. First, an objection to facts on relevancy grounds is improper at this stage because at summary judgment, the Court, not the parties decides whether a detail is relevant. *See* Fed. R. Civ. P. 56(e); *Boyce v. Carter*, 2014 WL 4436384, at *2 (N.D. Ill. Sept. 8, 2014). Second, paragraphs 5, 6, 7, and 8 merely summarize the circumstances in which the OP against Young was entered. (*Id.* at ¶¶ 5–8). Similarly, paragraphs 9 through 14 demonstrate there was an OP issued against Young and outline the restrictions that were imposed upon him. (*Id.* at ¶¶ 9–14). Paragraph 15 recounts the judge's statements to Young while entering the OP. These statements provide necessary context to the pending dispute. *United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006) ("It is well settled that non-hearsay statements are admissible if they are offered to provide context."). Moreover, Petro does not allege that she aware of the details mentioned in those paragraphs when she signed the criminal complaint. (*See*

Young arrived at the party, Natalie and CY-11 were not there yet. (Dkt. 34 ¶ 20). An hour or so later, Young became aware that Natalie was at the party. (*Id.* at ¶ 21). When Natalie determined that Young was not going to leave the party despite CY-11's presence, she and CY-11 left the party and went to the Joliet police station. (Dkt. 31-8, Exhibit H, Kuzma's Police Report). At the police station, Natalie told Joliet Police Officer Bryan Kuzma that CY-11 had an OP against Young and that they had been at a party where he was also present. (Dkt. 34 ¶ 25; Dkt. 30 at 3).[3] Kuzma filed a report documenting the incident. (Dkt. 31-8). Kuzma's report contained the phone numbers of three people: Young, Natalie, and the host of the Fourth of July party, Tamara Walker. (*Id.* at 2).

## II. Detective Petro's Investigation

The alleged OP violation was assigned to Petro for investigation. (Dkt. 34 ¶ 31). While Petro does not recall specifically reading Kuzma's police report, Petro stated at her deposition that she "would assume that [she] read the report." (Dkt. 31-2 at 13:2–5, Exhibit B – Deposition of Detective Petro). Petro does not recall speaking with any officer that initially spoke to Natalie. (Dkt. 37 ¶ 4). Petro believes she phoned and left voice messages for both Natalie and Young but did not receive a response from either of them. (Dkt. 31-2 at 47:23–49:17). She left two notes in her report that she "[c]alled mother of JUV victim and left voicemail on 7/07/2022[,]" (Dkt. 31-9, Exhibit I), and "left VM for Cecil Young." (Dkt. 31-10, Exhibit J). Her AT&T phone records show she called a phone number with the same last four digits as Young's on July 16, 2022. (Dkt. 37-1,

---

Dkt. 34). These facts are relevant and based on the transcripts from the county court proceeding and physical OP; therefore, the Court overrules Young's objections.
[3] Young objects to the Court considering Kuzma's report arguing it is inadmissible hearsay. (Dkt. 34 ¶¶ 24–30). Though police reports are generally excluded, there is an exception for portions of a report, which are based on the officer's firsthand observations. *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Additionally, the statements from the police report are not cited for their truth, but merely to show the effect that they had on Petro—namely that reading the report prompted her to investigate Natalie's complaint. *See Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000) (hearsay police report exempted if only used to show effect it had on officers).

3

Exhibit V – AT&T Records). Young denies that he ever received a call. (Dkt. 31-5 at 52:5–23, Exhibit E – Deposition of Cecil Young).

Petro contacted and spoke with Walker, the host of the Fourth of July party. (Dkt. 34 ¶ 34). Walker stated that she threw the party every year and that both Young and Natalie had open invitations to attend. (*Id.* at ¶ 36). During their conversation, Walker confirmed that Young and CY-11 were at the party at the same time. (*Id.* at ¶ 39). Walker also mentioned that Young knew CY-11 was at the party but remained there anyway. (*Id.* at ¶ 40). The information reported to Petro indicated that Natalie and CY-11 left the Walker home because Plaintiff remained at that location and did not leave. (*Id.* at ¶ 54).

As part of her investigation, Petro also searched the Law Enforcement Agencies Data System ("LEADS") for the details about the OP. (*Id.* at ¶ 44).

    a. **Objections to Conflicting Testimony in Detective Petro's Deposition and Subsequent Affidavit**

There is conflicting information contained in Petro's November 15, 2024, deposition testimony, (Dkt. 31-2), and her February 14, 2025, declaration as to her recollection of the LEADS report and OP. (31-11, Exhibit K – Declaration of Kristi Petro). In her deposition, Petro states that she never examined the OP itself but that "based on how [Petro] know[s] that [she] would handle this type of a case" that she "confirmed via LEADS that there was an active order of protection that had been served." (Dkt. 31-2 at 14:2–8). She stated:

> I don't have independent memory of what [the LEADS report] did or didn't say, but I would have obtained the LEADS printout as that's part of what we turn in when we submit that information to the State.

(*Id.* at 16:22–17:1; Dkt. 37 ¶ 1). In contrast, in her declaration, Petro states with certainty that she read the LEADS report concerning Natalie's OP against Young. (Dkt. 31-11 ¶¶ 6–12).

4

Young objects to the Court considering Petro's declaration based on the discrepancy. (Dkt. 34 ¶ 46). "Where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001) (citations modified).

Here, it is not demonstrable that Petro's deposition testimony was mistaken, and therefore, the Court disregards Petro's declaration as to her recollection of the LEADS report. (*See* Dkt. 31-2 at 16:22–17:1); *see also Hayes v. Crown Plaza*, 2004 WL 3250126, at *3 (S.D. Ind. Dec. 16, 2004) (a party cannot create genuine issue of material fact by disclaiming her recollection then contradicting that in a later affidavit) (citing *Clark v. Takata Corp.,* 192 F.3d 750, 760 (7th Cir. 1999). There was nothing confusing about the wording of the question at the deposition and Petro made her declaration months later. (Dkt. 31-2 at 14:2–8). Insofar as the objection takes issue with portions of the declaration, which do not contradict Petro's incomplete recollection of whether she read the LEADS report pertaining to the OP, the Court overrules the objection. Accordingly, the Court will evaluate Petro's understanding of the LEADS report using her deposition testimony.

### III. Petro's Signing Criminal Complaint Against Young

The LEADS report indicated that there was an active OP against Young and that the OP was in effect on the date of the party. (Dkt. 31-12 at 2, Exhibit L – the LEADS Report). The LEADS database only provided a summary or abbreviated version of the terms of the OP and did not contain an image of the actual order of protection itself. (Dkt. 34 ¶ 49). Specifically, the results indicated that the court-ordered relief included "Remedy/R01" relief and "Remedy/R03" relief. (*Id.* at ¶ 47). The report also stated that the OP prohibited Young from interfering with his

5

daughters' personal liberties and required him to stay away from certain places, such as the children's school (Dkt. 31-12 at 3)

Though Petro did not have an independent memory of reviewing the LEADS Report concerning Natalie's OP, she stated, she "imagine[d], based on [her] experience" that a LEADS report would have included the no contact order. (Dkt. 31-3 at 61:9–15). Further, Petro knew generally that if any relief was granted under Section 3, the actual OP would contain language prohibiting a respondent from having any direct or indirect contact with a protected person. (Dkt. 31-11 ¶ 17). Petro also understood such language as imposing a general "stay away" requirement, so that a respondent must stay away from any location where the protected person happens to be at a given time. (*Id.* at ¶¶18–19).

On July 21, 2022, Petro prepared and signed a misdemeanor complaint against Young, alleging that he violated the OP by entering and remaining at Walker's residence where CY-11 was also present—a violation under 720 ILCS 5/12–3.4. (Dkt. 34 ¶ 55; Dkt. 30 at 4; Dkt. 31-13. Exhibit M – Criminal Complaint). According to Petro's testimony about her report, her report stated that she called the Kendall County State's Attorney's Office to follow up on an arrest warrant she had dropped at that office. (Dkt. 31-2 at 37:7–11). On August 8, 2022, a Kendall County circuit court judge issued an arrest warrant for Young for violating the OP. (Dkt. 34 ¶ 57). On October 6, 2022, Young was arrested on the warrant after a traffic stop. (*Id.* at ¶ 58). On October 9, 2022, Young was released from custody on his own recognizance after the Circuit Court for Kendall County, Illinois found probable cause for the alleged offense in Case No. 22 CM 188. (*Id.* at ¶ 59; Dkt. 31-16, Exhibit P – Bond Order).

A trial date of May 22, 2023, was scheduled in Case No. 22 CM 188, with a final pre-trial conference set for May 10, 2023. (Dkt. 34 ¶ 60). At the final pre-trial conference on May 10, 2023,

the prosecutor informed the court that the State was not ready proceed with the trial as scheduled because the subpoenas to the material witnesses were not served. (*Id.* at ¶ 63). The prosecutor moved for a continuance of the trial date, and the court denied that motion. (*Id.* at ¶ 64). The prosecutor then moved to "nolle pros" the case, and the court granted that motion and entered an order dismissing the case. (*Id.*)

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*.

## **DISCUSSION**

Defendants seek summary judgment on two grounds: (I) Petro had probable cause to sign the criminal complaint; and (II) Petro is eligible for qualified immunity.

7

I.  **Probable Cause**

Defendants claim that there is no genuine dispute of material fact that Petro had probable cause to sign the criminal complaint against Young for violating the OP—and therefore, Defendants are entitled to summary judgment on all claims. (Dkt. 30 at 1). "To state a claim under the Fourth Amendment, a plaintiff must show that a search or seizure occurred and that the search or seizure was unreasonable." *Hess v. Garcia,* 72 F.4th 753, 761 (7th Cir. 2023). A seizure is reasonable when the officer has probable cause that the individual is engaging in criminal activity. *Ewell v. Toney,* 853 F.3d 911, 919 (7th Cir. 2017). Indeed, probable cause is an absolute defense to each of Young's Fourth Amendment claims: false arrest, unlawful pretrial detention and malicious prosecution under 28 U.S.C. §1983. *See Id.* (false arrest under Fourth Amendment); *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017) (pretrial detention under Fourth Amendment); *Martin v. Marinez*, 934 F.3d 594, 599 (7th Cir. 2019) (malicious prosecution under Fourth Amendment). Young has the burden of demonstrating a lack of probable cause. *Madero v. McGuinness*, 97 F.4th 516, 522 (7th Cir. 2024).

"Probable cause means that there are 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *United States v. Slone*, 636 F.3d 845, 849 (7th Cir. 2011) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Evaluating whether probable cause exists is "a common-sense inquiry requiring only a probability of criminal activity . . . . " *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010). A district court must assess probable cause "objectively," after considering "the conclusions that the arresting officer reasonably might have drawn from the information known to him." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir.

2007). "The officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). Moreover, statements by an eye witness, if true, can support probable cause, regardless of whether a defendant denies those allegations. *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006).

Whether an officer has probable cause also depends on the elements of the applicable criminal statute. *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012). Young was arrested for violating an OP. (*See* Dkt. 31-14, Arrest Warrant). Under 750 ILCS 5/12-3.4(a), "[a] person commits violation of an order of protection if: he or she knowingly commits an act which was prohibited by a court . . . in violation of" that OP. See *Calabrese v. Foxx*, 338 F. Supp. 3d 775, 782 (N.D. Ill. 2017). Violating an OP therefore requires both an *actus reus* (the act of violating the order) and a *mens rea* (the requisite mental state). *Dakhlallah v. Zima,* 42 F. Supp. 3d 901, 908 (N.D. Ill. 2014). As such, when a court imposes a "stay away" order, unintentional or accidental conduct does not violate that order, while voluntary and knowing conduct do. *See People v. Mandic,* 325 Ill. App. 3d 544, 549 (2d Dist. 2001).

Petro offers two main pieces of evidence to support her claim that she had a "reasonable belief" of probable cause that Young knowingly violated the OP. First, Petro contends that before signing the complaint, she believes that she searched the LEADS database, an official government database, to ascertain the terms of the OP. (Dkt. 30 at 7). Relying on a LEADS report is sufficient determine an officer has probable cause to sign a criminal complaint. *See e.g., Dakhlallah*, 42 F. Supp. 3d at 909; *Clevenger v. City of N. Webster Police Dep't*, 2017 WL 3494142, at *6 (N.D. Ind. Aug. 14, 2017) ("Once an officer has trustworthy information that leads him to reasonably believe that probable cause exists, he is entitled to rely on that information and is under no further duty to

9

investigate."); *see also Askew*, 440 F.3d at 896 (The "Constitution permits [police] to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution.").

It is undisputed that Petro searched the LEADS database. (Dkt. 34 ¶ 44). The database, however, did not contain the excerpt stipulating that if any protection is granted under Section 3, the defendant must not have any direct or indirect contact with the protected person. (Dkt. 31-13 at 3, Exhibit L – LEADS Report). It only stated that a Section 3 remedy was in place. (*Id.*) Further, Petro chose not to view the original OP, which spelled out the details of Young's obligations, even though she had the ability, and instead drew conclusions about its meaning from her law enforcement experience. (Dkt. 31-3, Exhibit B, 55:2–20). Further, at her deposition, Petro stated explicitly that though she generally understood that a Section 3 remedy means a defendant must not have any direct or indirect contact with the protected person, (Dkt. 31-2, 16:15–16), she had "no independent memory" of what the LEADS report or Young's OP said. (*Id.* at 16:22; Dkt. 37 ¶ 9). And Young avers that the only remedy selected in Section 3 of the OP prohibited him from attending his daughters' school. (Dkt. 33 at 8).

Unless all of the underlying facts are undisputed, " . . . in a § 1983 false-arrest case[,] the jury determines whether the arrest was supported by probable cause." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). Because Petro cannot state unequivocally that she read the LEADS report, which pertained to Young's OP, what she *did* read in the report is in dispute. Summary judgment is improper as to probable cause if there "is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013–14 (7th Cir. 2006).

To grant summary judgment based merely on Petro's belief as to what she read would require the Court to draw an inference that because she is an experienced law enforcement officer, she *probably* remembers seeing the Section 3 remedy checked in the LEADS report, which is inappropriate. *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435 (7th Cir. 1993) ("While the officers may prefer a standard of 'better safe than sorry,' they cannot hope to bootstrap an improbable threat to the community into probable cause . . . ."). Further, viewing the facts in Young's favor, as the Court is required, it is possible that Petro never ascertained with reasonable certainty that an active OP was in effect against Young. This crucial detail would, thus, undermine Petro's probable cause—whether she knew at the time that Young, in fact, was not allowed to have contact with his daughter. Moreover, since her recollection is hazy, assessing Petro's credibility as to whether she read the LEADS report is a question best left for a jury. *See Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) ("At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). A jury could find that Petro recklessly disregarded the truth when she neglected to view the OP and instead relied on her experience and her history of viewing other OPs. (Dkt. 31-3 at 55:2–20).

Because of the parties' dispute about Petro's recollection, Petro's irrefutable evidence that both Young and Walker were at the Fourth of July party and that Young stayed despite knowing that Natalie and CY-11 were present is immaterial. (*See* Dkt. 31-7, Exhibit F, Narrative Supplemental Report). True, it establishes that assuming an OP existed, Petro had probable cause that Young likely violated it. Walker stated to Petro that she hosted a party, which Young attended; and further, she told Petro that Young stayed at the party, even after learning Natalie and CY-11 were also there. (Dkt. 34 ¶¶ 35–41). But, because of Petro's incomplete recollection as to the OP,

11

Petro's conversation with Walker is unhelpful to establish probable cause that Young intentionally violated the OP. Though "[t]he complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest . . . " *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003), without verifying the existence of an OP, there would be no reason to sign a complaint against Young based on Walker's description of the incident.

This only leaves Petro's second piece of evidence: her knowledge of Kuzma's report, which also references the OP. Petro's memory of whether she read Kuzma's report suffers from the same flaw as her memory of the LEADS report. Petro never communicated with Kuzma. (Dkt. 34 ¶ 31). When asked whether she read Kuzma's report, which references the OP, she stated "I assumed that I read the report." (Dkt. 31-2 at 13:2–5). She fails to state with any certainty that she read the report. Moreover, even if Petro did read Kuzma's report, unlike the LEADS report which references the active OP and the Section 3 remedy, his report makes no such reference. (Dkt. 31-8 at 3). This reduces its evidentiary value in establishing that Petro had probable cause as to Young's "guilty mind" when he remained at the party despite the active OP.

Because Petro's knowledge of the OP depends on whether a jury would find her testimony credible, summary judgment as to whether Petro had actual probable cause is improper. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1013–14 (7th Cir. 2006).

## II.  Qualified Immunity

Petro contends that even if she cannot show there is no genuine dispute at to whether she had probable cause, she is entitled to qualified immunity. (Dkt. 30 at 9). "Qualified immunity shields government officials from civil damages liability unless the official violates a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Ewell*, 853 F.3d at 919 (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). To be "clearly established,"

a right must be one that any reasonable official would understand that what he is doing violates the right. *Reichle*, 566 U.S. at 664 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Undoubtedly, Young had a clearly established constitutional right to be free from arrest without probable cause at the time of the incident. *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).

In a § 1983 claim against an officer for false arrest, however, qualified immunity applies if the officer had "*arguable* probable cause" for an arrest. *Fakhoury v. Brongiel*, 2019 WL 2772546, at *2 (N.D. Ill. July 2, 2019) (quoting *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir. 2018)) (emphasis added). "Arguable probable cause is established when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 880 (7th Cir. 2012) (emphasis in original) (citations modified).

Though the arguable probable cause inquiry is similar to the actual probable cause assessment, there are differences: "whereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right." *Abbott*, 705 F.3d at 715; *see also Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 459 (7th Cir. 2010) (courts may find officer has qualified immunity even if the court finds officer did not have actual probable cause). In practical terms for a false arrest claim, this means that the objective inquiry asks, "whether a reasonable officer could have mistakenly believed that probable cause existed." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013) (citations omitted). Additionally, whether arguable probable cause 'supports qualified immunity is a pure question of law to be decided by the court.' " *Schimandle v. Dekalb*

13


*Cnty. Sheriff's Off.*, 114 F.4th 648, 656 (7th Cir. 2024) (citing *Cibulka v. City of Madison*, 992 F.3d 633, 639 n.2 (7th Cir. 2021)) (citations modified).

Here, Petro is entitled to qualified immunity—under the same circumstances, a reasonable officer in Petro's shoes *could* have reasonably believed probable cause existed. *Id.* The undisputed record demonstrates why: Since May 2022, there was an active OP in effect against Young, which stated that he was to have no contact with his daughters. (Dkt. 34 ¶ 9; 31-5 at 102:9–10). The LEADS report showed there was an active OP against Young with a Section 3 remedy. (Dkt 34 ¶ 44). It also stated that CY-11 was a protected person under the order. (*Id.*) Petro searched the LEADS database to determine whether there was an OP against Young. (*Id.*) Petro knew generally that if any relief was granted under Section 3, an OP would contain language prohibiting a respondent from having any direct or indirect contact with a protected person. (Dkt. 31-11 ¶ 17). Kuzma's report recounted Natalie's allegations that Young violated the court order. (Dkt. 31-8 at 3).

Though Petro did not read the actual OP and her recollection of reading Kuzma's notes and Young's LEADS entry is murky, which prevents the Court finding actual probable cause, the inquiry for qualified immunity discounts an officer's subjective beliefs. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (the "relevant question" ignores subjective intent and focuses on the "objective (albeit fact-specific) question"). Furthermore, Petro's conduct strongly suggests she read the reports. Petro investigated the alleged incident by calling at least two of the three numbers listed in Kuzma's report (Petro alleges she called Young as well, but he disputes this). (Dkt. 31-9, Exhibit I; Dkt. 34, ¶¶ 34, 43). This is evidenced not only by Petro's folder notes and by her AT&T phone records, but also by her conversation with Walker. (Dkt. 31-9; Dkt. 37-1 at 1). In that conversation, Walker stated that she invited Natalie and Young to her Fourth of July party. (Dkt.

34 ¶ 36). Walker also confirmed that Young and CY-11 were at the party at the same time and that Young knew his daughter was there but remained there anyway. (*Id.* at ¶¶ 39, 40). Because these facts are undisputed, this would have been sufficient for a reasonable officer to have probable cause that Young violated a no-contact order. *Askew*, 440 F.3d at 895.

Even if she did not read the LEADS report, Petro submitted the report to the Kendall County circuit court judge who issued an arrest warrant. (Dkt. 34 ¶¶ 57, 59). The judge's issuance of an arrest warrant against Young for violating the OP further supports the conclusion that Petro is entitled to qualified immunity. *Schimandle*, 114 F.4th at 657. In *Schimandle*, an officer interviewed witnesses after receiving reports that the dean of a public high school had committed a battery against a student. *Id.* at 652. The officer submitted his reports to a magistrate judge who approved the arrest warrant. *Id.* at 657. The Court explained that "[t]he magistrate judge's approval of the arrest warrant bolsters the officer's reasonable belief that probable cause supported the warrant and the application of qualified immunity." *Id.*; *see also Fleming*, 674 F.3d (consulting district attorney goes "a long way towards solidifying [a] qualified immunity defense.").

Qualified immunity provides "ample room for mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Schimandle*, 114 F.4th at 655 (citations modified). Petro's only "mistake" was not remembering whether she read the LEADS entry regarding Young's OP. This does not undermine qualified immunity; rather, the doctrine's shield turns on an objective inquiry—whether a reasonable officer in her position could have believed probable cause existed—not on the officer's subjective recollection. *See Monroe v. Mazzarano*, 1992 WL 199829, at *14 (N.D. Ill. Aug. 10, 1992) ("[T]he law is clear that both the defendants' subjective belief as to the existence of probable cause and the actual existence of probable cause are irrelevant to the issue of qualified immunity.").

Thus, while the dispute over Petro's recollection prevents the Court from finding that she had actual probable cause, "qualified immunity affords an added layer of protection." *Abbott*, 705 F.3d at 715. This extra layer is sufficient for the Court to grant Petro's summary judgment motion as to Young's Fourth Amendment claims.

### III. State Claim for Malicious Prosecution

Because Young has agreed to dismiss his malicious prosecution claim, that count is dismissed. (Dkt. 33 at 13).

### CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment [29].

_____
Virginia M. Kendall
United States District Judge

Date: September 11, 2025